In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1720

KIMBERLY HIVELY,

*Plaintiff-Appellant,*

*v.*

IVY TECH COMMUNITY COLLEGE OF INDIANA,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:14-cv-1791 — **Rudy Lozano**, *Judge.*

ARGUED NOVEMBER 30, 2016 — DECIDED APRIL 4, 2017

Before WOOD, *Chief Judge*, and BAUER, POSNER, FLAUM,
EASTERBROOK, RIPPLE, KANNE, ROVNER, WILLIAMS, SYKES, and
HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. Title VII of the Civil Rights Act of 1964
makes it unlawful for employers subject to the Act to discrim-
inate on the basis of a person's "race, color, religion, sex, or
national origin … ." 42 U.S.C. § 2000e-2(a). For many years,
the courts of appeals of this country understood the prohibi-
tion against sex discrimination to exclude discrimination on

the basis of a person's sexual orientation. The Supreme Court, however, has never spoken to that question. In this case, we have been asked to take a fresh look at our position in light of developments at the Supreme Court extending over two decades. We have done so, and we conclude today that discrimination on the basis of sexual orientation is a form of sex discrimination. We therefore reverse the district court's judgment dismissing Kimberly Hively's suit against Ivy Tech Community College and remand for further proceedings.

# I

Hively is openly lesbian. She began teaching as a part-time, adjunct professor at Ivy Tech Community College's South Bend campus in 2000. Hoping to improve her lot, she applied for at least six full-time positions between 2009 and 2014. These efforts were unsuccessful; worse yet, in July 2014 her part-time contract was not renewed. Believing that Ivy Tech was spurning her because of her sexual orientation, she filed a pro se charge with the Equal Employment Opportunity Commission on December 13, 2013. It was short and to the point:

> I have applied for several positions at IVY TECH, fulltime, in the last 5 years. I believe I am being blocked from fulltime employment without just cause. I believe I am being discriminated against based on my sexual orientation. I believe I have been discriminated against and that my rights under Title VII of the Civil Rights Act of 1964 were violated.

After receiving a right-to-sue letter, she filed this action in the district court (again acting pro se). Ivy Tech responded with a motion to dismiss for failure to state a claim on which relief

can be granted. It argued that sexual orientation is not a protected class under Title VII or 42 U.S.C. § 1981 (which we will disregard for the remainder of this opinion). Relying on a line of this court's cases exemplified by *Hamner v. St. Vincent Hosp. and Health Care Ctr., Inc.*, 224 F.3d 701 (7th Cir. 2000), the district court granted Ivy Tech's motion and dismissed Hively's case with prejudice.

Now represented by the Lambda Legal Defense & Education Fund, Hively has appealed to this court. After an exhaustive exploration of the law governing claims involving discrimination based on sexual orientation, the panel affirmed. *Hively v. Ivy Tech Cmty. Coll.*, 830 F.3d 698 (7th Cir. 2016). It began its analysis by noting that the idea that discrimination based on sexual orientation is somehow distinct from sex discrimination originated with dicta in *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081 (7th Cir. 1984). *Ulane* stated (as if this resolved matters) that Title VII's prohibition against sex discrimination "implies that it is unlawful to discriminate against women because they are women and against men because they are men." *Id.* at 1085. From this truism, we deduced that "Congress had nothing more than the traditional notion of 'sex' in mind when it voted to outlaw sex discrimination … ." *Doe v. City of Belleville, Ill.*, 119 F.3d 563, 572 (7th Cir. 1997), *cert. granted, judgment vacated sub nom. City of Belleville v. Doe*, 523 U.S. 1001 (1998), *abrogated by Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998).

Later cases in this court, including *Hamm v. Weyauwega Milk Prods.*, 332 F.3d 1058 (7th Cir. 2003), *Hamner*, and *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1085 (7th Cir. 2000), have accepted this as settled law. Almost all of our sister circuits have understood the law in the same way. See, *e.g., Higgins v.*

*New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir. 1999); *Dawson v. Bumble & Bumble*, 398 F.3d 211, 217 (2d Cir. 2005); *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 290 (3d Cir. 2009); *Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d 138, 143 (4th Cir. 1996); *Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir. 1979); *Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 471 (6th Cir. 2012); *Williamson v. A.G. Edwards & Sons, Inc.*, 876 F.2d 69, 70 (8th Cir. 1989); *Medina v. Income Support Div.*, 413 F.3d 1131, 1135 (10th Cir. 2005); *Fredette v. BVP Mgmt. Assocs.*, 112 F.3d 1503, 1510 (11th Cir. 1997). A panel of the Eleventh Circuit, recognizing that it was bound by the Fifth Circuit's precedent in *Blum*, 597 F.2d 936, recently reaffirmed (by a 2–1 vote) that it could not recognize sexual orientation discrimination claims under Title VII. *Evans v. Georgia Reg'l Hosp.*, No. 15-15234, 2017 WL 943925, at *5–6 (11th Cir. Mar. 10, 2017). On the other hand, the Second Circuit recently found that an openly gay male plaintiff pleaded a claim of gender stereotyping that was sufficient to survive dismissal. The court observed that one panel lacked the power to reconsider the court's earlier decision holding that sexual orientation discrimination claims were not cognizable under Title VII. *Christiansen v. Omnicom Group, Inc.*, No. 16-748 (2d Cir. Mar. 27, 2017) (per curiam). Nonetheless, two of the three judges, relying on many of the same arguments presented here, noted in concurrence that they thought their court ought to consider revisiting that precedent in an appropriate case. *Id.* at 2 (Katzmann, J., concurring). Notable in its absence from the debate over the proper interpretation of the scope of Title VII's ban on sex discrimination is the United States Supreme Court.

That is not because the Supreme Court has left this subject entirely to the side. To the contrary, as the panel recognized, over the years the Court has issued several opinions that are

relevant to the issue before us. Key among those decisions are *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), and *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998). *Price Water-house* held that the practice of gender stereotyping falls within Title VII's prohibition against sex discrimination, and *Oncale* clarified that it makes no difference if the sex of the harasser is (or is not) the same as the sex of the victim. Our panel frankly acknowledged how difficult it is "to extricate the gender nonconformity claims from the sexual orientation claims." 830 F.3d at 709. That effort, it commented, has led to a "confused hodge-podge of cases." *Id.* at 711. It also noted that "all gay, lesbian and bisexual persons fail to comply with the sine qua non of gender stereotypes—that all men should form intimate relationships only with women, and all women should form intimate relationships only with men." *Id.* Especially since the Supreme Court's recognition that the Due Process and Equal Protection Clauses of the Constitution protect the right of same-sex couples to marry, *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015), bizarre results ensue from the current regime. As the panel noted, it creates "a paradoxical legal landscape in which a person can be married on Saturday and then fired on Monday for just that act." 830 F.3d at 714. Finally, the panel highlighted the sharp tension between a rule that fails to recognize that discrimination on the basis of the sex with whom a person associates is a form of sex discrimination, and the rule, recognized since *Loving v. Virginia*, 388 U.S. 1 (1967), that discrimination on the basis of the race with whom a person associates is a form of racial discrimination.

Despite all these problems, the panel correctly noted that it was bound by this court's precedents, to which we referred earlier. It thought that the handwriting signaling their demise

might be on the wall, but it did not feel empowered to translate that message into a holding. "Until the writing comes in the form of a Supreme Court opinion or new legislation," 830 F.3d at 718, it felt bound to adhere to our earlier decisions. In light of the importance of the issue, and recognizing the power of the full court to overrule earlier decisions and to bring our law into conformity with the Supreme Court's teachings, a majority of the judges in regular active service voted to rehear this case en banc.

## II

### A

The question before us is not whether this court can, or should, "amend" Title VII to add a new protected category to the familiar list of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Obviously that lies beyond our power. We must decide instead what it means to discriminate on the basis of sex, and in particular, whether actions taken on the basis of sexual orientation are a subset of actions taken on the basis of sex.[1] This is a pure question of statutory interpretation and thus well within the judiciary's competence.

Much ink has been spilled about the proper way to go about the task of statutory interpretation. One can stick, to the greatest extent possible, to the language enacted by the legislature; one could consult the legislative history that led up to

---

[1] For present purposes, we have no need to decide whether discrimination on the basis of "gender" is for legal purposes the same as discrimination on the basis of "sex," which is the statutory term. Many courts, including the Supreme Court, appear to have used "sex" and "gender" synonymously. Should a case arise in which the facts require us to examine the differences (if any) between the terms, we will do so then.

the bill that became law; one could examine later actions of the legislature (*i.e.* efforts to amend the law and later enactments) for whatever light they may shed; and one could use a combination of these methods. See, *e.g.*, William Eskridge, Jr., & Philip Frickey, *Legislation and Statutory Interpretation* (2d ed. 2007); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012); Adrian Vermeule, *Judging Under Uncertainty: An Institutional Theory of Legal Interpretation* (2006); Victoria F. Nourse, *A Decision Theory of Statutory Interpretation: Legislative History by the Rules*, 122 Yale L.J. 70 (2012); Cass R. Sunstein, *Interpreting Statutes in the Regulatory State*, 103 Harv. L. Rev. 407 (1989).

Few people would insist that there is a need to delve into secondary sources if the statute is plain on its face. Even if it is not pellucid, the best source for disambiguation is the broader context of the statute that the legislature—in this case, Congress—passed. This is uncontroversial when the reading seems consistent with the conventional wisdom about the reach of the law. It becomes somewhat harder to swallow if the language reveals suspected or actual unintended consequences. It is then that some have thought that legislative history should be used to block a particular reading of a statute. Legislative history, however, is notoriously malleable. Even worse is the temptation to try to divine the significance of unsuccessful legislative efforts to change the law. Those failures can mean almost anything, ranging from the lack of necessity for a proposed change because the law already accomplishes the desired goal, to the undesirability of the change because a majority of the legislature is happy with the way the courts are currently interpreting the law, to the irrelevance of the non-enactment, when it is attributable to nothing more than

legislative logrolling or gridlock that had nothing to do with its merits.

Ivy Tech sets great store on the fact that Congress has frequently considered amending Title VII to add the words "sexual orientation" to the list of prohibited characteristics, yet it has never done so. Many of our sister circuits have also noted this fact. In our view, however, it is simply too difficult to draw a reliable inference from these truncated legislative initiatives to rest our opinion on them. The goalposts have been moving over the years, as the Supreme Court has shed more light on the scope of the language that already is in the statute: no *sex* discrimination.

The dissent makes much of the fact that Congresses acting more than thirty years after the passage of Title VII made use of the term "sexual orientation" to prohibit discrimination or violence on that basis in statutes such as the Violence Against Women Act and the federal Hate Crimes Act. But this gets us no closer to answering the question at hand, for Congress may certainly choose to use both a belt and suspenders to achieve its objectives, and the fact that "sex" and "sexual orientation" discrimination may overlap in later statutes is of no help in determining whether sexual orientation discrimination *is* discrimination on the basis of sex for the purposes of Title VII. See, *e.g.*, *McEvoy v. IEI Barge Servs., Inc.*, 622 F.3d 671, 677 (7th Cir. 2010) ("Congress may choose a belt-and-suspenders approach to promote its policy objectives… .").

Moreover, the agency most closely associated with this law, the Equal Employment Opportunity Commission, in 2015 announced that it now takes the position that Title VII's prohibition against sex discrimination encompasses discrimination on the basis of sexual orientation. See *Baldwin v. Foxx*,

EEOC Appeal No. 0120133080, 2015 WL 4397641 (July 15, 2015). Our point here is not that we have a duty to defer to the EEOC's position. We assume for present purposes that no such duty exists. But the Commission's position may have caused some in Congress to think that legislation is needed to carve sexual orientation *out* of the statute, not to put it *in*. In the end, we have no idea what inference to draw from congressional inaction or later enactments, because there is no way of knowing what explains each individual member's votes, much less what explains the failure of the body as a whole to change this 1964 statute.

Our interpretive task is guided instead by the Supreme Court's approach in the closely related case of *Oncale*, where it had this to say as it addressed the question whether Title VII covers sexual harassment inflicted by a man on a male victim:

> We see no justification in the statutory language or our precedents for a categorical rule excluding same-sex harassment claims from the coverage of Title VII. As some courts have observed, male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII. But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed. Title VII prohibits "discriminat[ion] … because of … sex" in the "terms" or "conditions" of employment. Our holding that this in-

cludes sexual harassment must extend to sexual har-
assment of any kind that meets the statutory require-
ments.

523 U.S. at 79–80. The Court could not have been clearer: the
fact that the enacting Congress may not have anticipated a
particular application of the law cannot stand in the way of
the provisions of the law that are on the books.

It is therefore neither here nor there that the Congress that
enacted the Civil Rights Act in 1964 and chose to include sex
as a prohibited basis for employment discrimination (no mat-
ter why it did so) may not have realized or understood the full
scope of the words it chose. Indeed, in the years since 1964,
Title VII has been understood to cover far more than the sim-
ple decision of an employer not to hire a woman for Job A, or
a man for Job B. The Supreme Court has held that the prohi-
bition against sex discrimination reaches sexual harassment
in the workplace, see *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S.
57 (1986), including same-sex workplace harassment, see *On-
cale*; it reaches discrimination based on actuarial assumptions
about a person's longevity, see *City of Los Angeles, Dep't of Wa-
ter and Power v. Manhart*, 435 U.S. 702 (1978); and it reaches
discrimination based on a person's failure to conform to a cer-
tain set of gender stereotypes, see *Hopkins*. It is quite possible
that these interpretations may also have surprised some who
served in the 88th Congress. Nevertheless, experience with
the law has led the Supreme Court to recognize that each of
these examples is a covered form of sex discrimination.

B

Hively offers two approaches in support of her contention
that "sex discrimination" includes discrimination on the basis

of sexual orientation. The first relies on the tried-and-true comparative method in which we attempt to isolate the significance of the plaintiff's sex to the employer's decision: has she described a situation in which, holding all other things constant and changing only her sex, she would have been treated the same way? The second relies on the *Loving v. Virginia*, 388 U.S. 1 (1967), line of cases, which she argues protect her right to associate intimately with a person of the same sex. Although the analysis differs somewhat, both avenues end up in the same place: sex discrimination.

1

It is critical, in applying the comparative method, to be sure that only the variable of the plaintiff's sex is allowed to change. The fundamental question is not whether a lesbian is being treated better or worse than gay men, bisexuals, or transsexuals, because such a comparison shifts too many pieces at once. Framing the question that way swaps the critical characteristic (here, sex) for both the complainant and the comparator and thus obscures the key point—whether the complainant's protected characteristic played a role in the adverse employment decision. The counterfactual we must use is a situation in which Hively is a man, but everything else stays the same: in particular, the sex or gender of the partner.

Hively alleges that if she had been a man married to a woman (or living with a woman, or dating a woman) and everything else had stayed the same, Ivy Tech would not have refused to promote her and would not have fired her. (We take the facts in the light most favorable to her, because we are here on a Rule 12(b)(6) dismissal; naturally nothing we say will prevent Ivy Tech from contesting these points in later proceedings.) This describes paradigmatic sex discrimination. To

use the phrase from *Ulane*, Ivy Tech is disadvantaging her *because she is a woman*. Nothing in the complaint hints that Ivy Tech has an anti-marriage policy that extends to heterosexual relationships, or for that matter even an anti-partnership policy that is gender-neutral.

Viewed through the lens of the gender non-conformity line of cases, Hively represents the ultimate case of failure to conform to the female stereotype (at least as understood in a place such as modern America, which views heterosexuality as the norm and other forms of sexuality as exceptional): she is not heterosexual. Our panel described the line between a gender nonconformity claim and one based on sexual orientation as gossamer-thin; we conclude that it does not exist at all. Hively's claim is no different from the claims brought by women who were rejected for jobs in traditionally male workplaces, such as fire departments, construction, and policing. The employers in those cases were policing the boundaries of what jobs or behaviors they found acceptable for a woman (or in some cases, for a man).

This was the critical point that the Supreme Court was making in *Hopkins*. The four justices in the plurality and the two justices concurring in the judgment recognized that Hopkins had alleged that her employer was discriminating only against women who behaved in what the employer viewed as too "masculine" a way—no makeup, no jewelry, no fashion sense.[2] And even before *Hopkins*, courts had found sex dis-

_____

[2] The dissent correctly points out that *Hopkins* was a plurality opinion, but that fact is of no moment in understanding what we are to take from the plurality's discussion of sex stereotyping. On the critical issue— whether the conduct about which Hopkins complained could support a

crimination in situations where women were resisting stereotypical roles. As far back as 1971, the Supreme Court held that Title VII does not permit an employer to refuse to hire women with pre-school-age children, but not men. *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971). Around the same time, this court held that Title VII "strike[s] at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes," *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1198 (7th Cir. 1971), and struck down a rule requiring only the female employees to be unmarried. In both those instances, the employer's rule did not affect every woman in the workforce. Just so here: a policy that discriminates on the basis of sexual orientation does not affect every woman, or every man, but it is based on assumptions about the proper behavior for someone of a given sex.[3] The discriminatory behavior does

finding of sex discrimination for purposes of Title VII—at least six justices were in agreement that the answer was yes. Justice Brennan's opinion for the four-person plurality was clear: "In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." 490 U.S. at 250. Justice White, concurring in the judgment, stated that he agreed that an unlawful motive was a substantial factor in the adverse employment action Hopkins suffered. *Id.* at 259. Justice O'Connor, also concurring in the judgment, "agree[d] with the plurality that, on the facts presented in this case, the burden of persuasion should shift to the employer to demonstrate by a preponderance of the evidence that it would have reached the same decision concerning Ann Hopkins' candidacy absent consideration of her gender." *Id.* at 261. Justice Kennedy's dissenting opinion did not need to dwell on this point, because he found that Hopkins could not prove causation.

[3] The dissent questions in its conclusion what a jury ought to do in the hypothetical case in which Ivy Tech hired six heterosexual women for the full-time positions. But, as we note, the Supreme Court has made it clear that a policy need not affect *every* woman to constitute sex discrimination.

not exist without taking the victim's biological sex (either as observed at birth or as modified, in the case of transsexuals) into account. Any discomfort, disapproval, or job decision based on the fact that the complainant—woman or man— dresses differently, speaks differently, or dates or marries a same-sex partner, is a reaction purely and simply based on sex. That means that it falls within Title VII's prohibition against sex discrimination, if it affects employment in one of the specified ways.

The virtue of looking at comparators and paying heed to gender non-conformity is that this process sheds light on the interpretive question raised by Hively's case: is sexual-orientation discrimination a form of sex discrimination, given the way in which the Supreme Court has interpreted the word "sex" in the statute? The dissent criticizes us for not trying to *rule out* sexual-orientation discrimination by controlling for it in our comparator example and for not placing any weight on the fact that if someone had asked Ivy Tech what its reasons were at the time of the discriminatory conduct, it probably would have said "sexual orientation," not "sex." We assume that this is true, but this thought experiment does not answer the question before us—instead, it begs that question. It commits the logical fallacy of assuming the conclusion it sets out to prove. It makes no sense to control for or rule out discrimination on the basis of sexual orientation if the question before us is *whether* that type of discrimination is nothing more or less than a form of sex discrimination. Repeating that the two

---

What if Hively had been heterosexual, too, but did not get the job because she failed to wear high heels, lipstick, or perfume like the other candidates? A failure to discriminate against all women does not mean that an employer has not discriminated against one woman on the basis of sex.

are different, as the dissent does at numerous points, also does not advance the analysis.

2

As we noted earlier, Hively also has argued that action based on sexual orientation is sex discrimination under the associational theory. It is now accepted that a person who is discriminated against because of the protected characteristic of one with whom she associates is actually being disadvantaged because of her own traits. This line of cases began with *Loving*, in which the Supreme Court held that "restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause." 388 U.S. at 12. The Court rejected the argument that miscegenation statutes do not violate equal protection because they "punish equally both the white and the Negro participants in an interracial marriage." *Id.* at 8. When dealing with a statute containing racial classifications, it wrote, "the fact of equal application does not immunize the statute from the very heavy burden of justification" required by the Fourteenth Amendment for lines drawn by race. *Id*. at 9.

In effect, both parties to the interracial marriage were being denied important rights by the state solely on the basis of their race. This point by now has been recognized for many years. For example, in *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888 (11th Cir. 1986), the Eleventh Circuit considered a case in which a white man (Parr) married to an African-American woman was denied employment by an insurance company because of his interracial marriage. He sued under Title VII, but the district court dismissed the complaint on the ground that it failed to describe discrimination on the basis of race. The court of appeals reversed. It held that "[w]here a

plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of *his* race." *Id.* at 892. It also rejected the employer's somewhat bizarre argument that, given the allegation that it discriminated against all African-Americans, Parr could not show that it would have made a difference if he also had been African-American. *Id.* The court contented itself with describing that as a lawsuit for another day.

The Second Circuit took the same position two decades later in *Holcomb v. Iona Coll.*, 521 F.3d 130 (2d Cir. 2008), in which a white former employee of the college sued, alleging that it fired him from his job as associate coach of the men's basketball team because he was married to an African-American woman. The court held "that an employer may violate Title VII if it takes action against an employee because of the employee's association with a person of another race." *Id.* at 132. It stressed that the plaintiff's case did not depend on third-party injury. To the contrary, it held, "where an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's *own* race." *Id.* at 139. Had the plaintiff been African-American, the question whether race discrimination tainted the employer's action would have depended on different facts.

We have not faced exactly the same situation as that in *Parr* and *Holcomb*, but we have come close. In *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878 (7th Cir. 1998), we encountered a case in which white employees brought an action under Title VII on the theory that they were being subjected to a hostile working environment and ultimately discharged because of

their association with African-American co-workers. Because the defendant conceded that an employee can bring an asso-ciational race discrimination claim under Title VII, we had no need to say much on that point. Instead, we assumed for the sake of argument that an associational race discrimination claim is possible, and that the key inquiries are whether the employee has experienced discrimination and whether that discrimination was because of race. *Id.* at 884. This is con-sistent with *Holcomb*.

The fact that we now accept this analysis tells us nothing, however, about the world in 1967, when *Loving* reached the Supreme Court. The dissent implies that we are adopting an anachronistic view of Title VII, enacted just three years before *Loving*, but it is the dissent's understanding of *Loving* and the miscegenation laws that is an anachronism. Thanks to *Loving* and the later cases we mentioned, society understands now that such laws are (and always were) inherently racist. But as of 1967 (and thus as of 1964), Virginia and 15 other states had anti-miscegenation laws on the books. *Loving*, 388 U.S. at 6. These laws were long defended and understood as non-dis-criminatory because the legal obstacle affected *both* partners. The Court in *Loving* recognized that equal application of a law that prohibited conduct only between members of different races did not save it. Changing the race of one partner made a difference in determining the legality of the conduct, and so the law rested on "distinctions drawn according to race," which were unjustifiable and racially discriminatory. [4] *Loving*,

---

[4] The dissent seems to imply that the discrimination in *Loving* was problematic because the miscegenation laws were designed to maintain the supremacy of one race—and by extension that sexual orientation dis-crimination is not a problem because it is not designed to maintain the

388 U.S. at 11. So too, here. If we were to change the sex of one partner in a lesbian relationship, the outcome would be different. This reveals that the discrimination rests on distinctions drawn according to sex.

The dissent would instead have us compare the treatment of men who are attracted to members of the male sex with the treatment of women who are attracted to members of the female sex, and ask whether an employer treats the men differently from the women. But even setting to one side the logical fallacy involved, *Loving* shows why this fails. In the context of interracial relationships, we could just as easily hold constant a variable such as "sexual or romantic attraction to persons of a different race" and ask whether an employer treated persons of different races who shared that propensity the same. That is precisely the rule that *Loving* rejected, and so too must we, in the context of sexual associations.

The fact that *Loving*, *Parr*, and *Holcomb* deal with racial associations, as opposed to those based on color, national origin, religion, or sex, is of no moment. The text of the statute draws no distinction, for this purpose, among the different varieties of discrimination it addresses—a fact recognized by the *Hopkins* plurality. See 490 U.S. at 244 n.9. This means that to the extent that the statute prohibits discrimination on the basis of the race of someone with whom the plaintiff associates, it also prohibits discrimination on the basis of the national origin, or the color, or the religion, or (as relevant here) the sex of the

---

supremacy of one sex. But while this was certainly a repugnant feature of Virginia's law, it was not the basis of the holding in *Loving*. Rather, the Court found the racial classifications to be at odds with the Constitution, "even assuming an even-handed state purpose to protect the 'integrity' of all races." *Loving*, 388 U.S. at 11 n.11.

associate. No matter which category is involved, the essence of the claim is that the *plaintiff* would not be suffering the adverse action had his or her sex, race, color, national origin, or religion been different.

**III**

Today's decision must be understood against the backdrop of the Supreme Court's decisions, not only in the field of employment discrimination, but also in the area of broader discrimination on the basis of sexual orientation. We already have discussed the employment cases, especially *Hopkins* and *Oncale*. The latter line of cases began with *Romer v. Evans*, 517 U.S. 620 (1996), in which the Court held that a provision of the Colorado Constitution forbidding any organ of government in the state from taking action designed to protect "homosexual, lesbian, or bisexual" persons, *id.* at 624, violated the federal Equal Protection Clause. *Romer* was followed by *Lawrence v. Texas*, 539 U.S. 558 (2003), in which the Court found that a Texas statute criminalizing homosexual intimacy between consenting adults violated the liberty provision of the Due Process Clause. Next came *United States v. Windsor*, 133 S.Ct. 2675 (2013), which addressed the constitutionality of the part of the Defense of Marriage Act (DOMA) that excluded a same-sex partner from the definition of "spouse" in other federal statutes. The Court held that this part of DOMA "violate[d] basic due process and equal protection principles applicable to the Federal Government." *Id.* at 2693. Finally, the Court's decision in *Obergefell*, *supra*, held that the right to marry is a fundamental liberty right, protected by the Due Process and Equal Protection Clauses of the Fourteenth Amendment. 135 S.Ct. at 2604. The Court wrote that "[i]t is now clear that the challenged laws burden the liberty of same-

sex couples, and it must be further acknowledged that they abridge central precepts of equality." *Id.*

It would require considerable calisthenics to remove the "sex" from "sexual orientation." The effort to do so has led to confusing and contradictory results, as our panel opinion illustrated so well.[5] The EEOC concluded, in its *Baldwin* decision, that such an effort cannot be reconciled with the straightforward language of Title VII. Many district courts have come to the same conclusion. See, *e.g.*, *Boutillier v. Hartford Pub. Sch.*, No. 3:13-CV-01303-WWE, 2016 WL 6818348 (D. Conn. Nov. 17, 2016); *U.S. Equal Emp't Opportunity Comm'n v. Scott Med. Ctr., P.C.*, No. CV 16-225, 2016 WL 6569233 (W.D. Pa. Nov. 4, 2016); *Winstead v. Lafayette Cnty. Bd. of Cnty. Comm'rs*, No. 1:16CV00054-MW-GRJ, 2016 WL 3440601 (N.D. Fla. June 20,

---

[5] The dissent contends that a fluent speaker of the English language would understand that "sex" does not include the concept of "sexual orientation," and this ought to demonstrate that the two are easily distinguishable and not the same. But this again assumes the answer to the question before us: how to interpret the statute in light of the guidance the Supreme Court has provided. The dissent is correct that the term "sexual orientation" was not defined in the dictionary around the time of Title VII's enactment, but neither was the term "sexual harassment"—a concept that, although it can be distinguished from "sex," has at least since 1986 been included by the Supreme Court under the umbrella of sex discrimination. See WEBSTER'S NEW COLLEGIATE DICTIONARY (7th ed. 1963) (lacking an entry for "sexual harassment" or "sexual orientation"); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1st ed. 1969) (same). The dissent postulates that it is implausible that a reasonable person in 1964 could have understood discrimination based on sex to include sexual orientation discrimination. But that reasonable person similarly may not have understood it to include sexual harassment (and, by extension, not male-on-male sexual harassment). As *Oncale* said, we are concerned with the provisions of the law, not the principal concerns of those who wrote it. 523 U.S. at 80. The approach we have taken does just that.

2016); *Isaacs v. Felder Servs., LLC*, 143 F. Supp. 3d 1190 (M.D. Ala. 2015); see also *Videckis v. Pepperdine Univ.*, 150 F. Supp. 3d 1151 (C.D. Cal. 2015) (Title IX case, applying Title VII principles and *Baldwin*). Many other courts have found that gender-identity claims are cognizable under Title VII. See, *e.g.*, *Rosa v. Park W. Bank & Tr. Co.*, 214 F.3d 213, 215–16 (1st Cir. 2000) (claim for sex discrimination under Equal Credit Opportunity Act, analogizing to Title VII); *Schwenk v. Hartford*, 204 F.3d 1187, 1201–02 (9th Cir. 2000) (relying on Title VII cases to conclude that violence against a transsexual was violence because of gender under the Gender Motivated Violence Act); *Barnes v. City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005); *Smith v. City of Salem, Ohio*, 378 F.3d 566 (6th Cir. 2004); *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509 (D. Conn. 2016); *Schroer v. Billington*, 577 F. Supp. 2d 293, 308 (D.D.C. 2008).

This is not to say that authority to the contrary does not exist. As we acknowledged at the outset of this opinion, it does. But this court sits en banc to consider what the correct rule of law is now in light of the Supreme Court's authoritative interpretations, not what someone thought it meant one, ten, or twenty years ago.[6] The logic of the Supreme Court's

---

[6] The dissent criticizes us for this approach, but we find nothing surprising in the fact that lower courts may have been wrong for many years in how they understood the rule of law supplied by a statute or the Constitution. Exactly this has happened before. For example, in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), the Supreme Court disapproved a rule of statutory interpretation that all eleven regional courts of appeals had followed—most for over three decades. When the Court decided *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560 (2012) (deciding that the provision for compensating interpreters in 28 U.S.C. § 1920(6) does not include costs for document translation), it rejected the views of at least six circuits with regard to the proper reading of the statute. 556 U.S. at 577 (Ginsburg, J., dissenting). See also *Milner v.*

decisions, as well as the common-sense reality that it is actually impossible to discriminate on the basis of sexual orientation without discriminating on the basis of sex, persuade us that the time has come to overrule our previous cases that have endeavored to find and observe that line.

For the sake of comprehensiveness, we note that Ivy Tech presents two technical reasons why it thinks this case should not be heard: waiver and sovereign immunity. Neither one persuades us. Though Hively (acting pro se) did not advance the same arguments to the district court, that court would have been powerless to overturn precedent. We, in contrast, are proceeding on a de novo basis, and we have the discretion to address issues for the first time on appeal. *Kaczmarek v. Rednour*, 627 F.3d 586, 595 (7th Cir. 2010). We often exercise that discretion to entertain arguments that turn on pure issues of law. See, *e.g.*, *Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 750 (7th Cir. 1993) (concluding "[t]here will be no better time to resolve the issue than now."). There was no waiver. As for sovereign immunity, Ivy Tech acknowledges that federal courts have long concluded that Congress validly abrogated the

---

*Dep't of the Navy*, 562 U.S. 562, 585 (2011) (Breyer, J., dissenting) (noting that the Court's decision rejected the interpretation of Exemption 2 to the Freedom of Information Act that had been consistently followed or favorably cited by every court of appeals to have considered the matter over a 30-year period). It would be more controversial to assert that this is one of the rare statutes left for common-law development, as our concurring colleague does. In any event, that common-law development, both for the antitrust laws and any other candidates, is the responsibility of the Supreme Court. See *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (recognizing that only the Supreme Court could jettison the *per se* rule against maximum pricefixing). All we can do is what we have done here: apply the relevant Supreme Court decisions to the statute to the best of our ability.

state's immunity with respect to intentional discrimination claims under Title VII. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976); *Nanda v. Bd. of Trs. of Univ. of Ill.*, 303 F.3d 817, 831 (7th Cir. 2002). There is no merit whatsoever to that point.

We close by noting that we have decided only the issue put before us. Additional complications can be saved for another day, when they are actually involved in the case. Ivy Tech did not contend, for example, that it was a religious institution and the positions it denied to Hively related to a religious mission.[7] See 42 U.S.C. § 2000e-1(a). Nor have we had any occasion to consider the meaning of discrimination in the context of the provision of social or public services. We hold only that a person who alleges that she experienced employment discrimination on the basis of her sexual orientation has put forth a case of sex discrimination for Title VII purposes. It was therefore wrong to dismiss Hively's complaint for failure to state a claim. The judgment of the district court is REVERSED and the case is REMANDED for further proceedings.

---

[7] Indeed, in contrast to cases in which a religious employer may be exempted from Title VII liability because they have a bona fide need to discriminate on the basis of a protected characteristic, we note that Ivy Tech's position does not seem to reflect any fundamental desire to be permitted to engage in discrimination on the basis of sexual orientation. To the contrary, Ivy Tech maintains that it has its own internal policy prohibiting such discrimination. It could repeal that policy tomorrow, however, and so we will not look behind its decision to contest Hively's claim.

POSNER, *Circuit Judge*, concurring. I agree that we should reverse, and I join the majority opinion, but I wish to explore an alternative approach that may be more straightforward.

It is helpful to note at the outset that the interpretation of statutes comes in three flavors. The first and most conventional is the extraction of the original meaning of the statute—the meaning intended by the legislators—and corresponds to interpretation in ordinary discourse. Knowing English I can usually determine swiftly and straightforwardly the meaning of a statement, oral or written, made to me in English (not always, because the statement may be garbled, grammatically intricate or inaccurate, obtuse, or complex beyond my ability to understand).

The second form of interpretation, illustrated by the commonplace local ordinance which commands "no vehicles in the park," is interpretation by unexpressed intent, whereby we understand that although an ambulance is a vehicle, the ordinance was not intended to include ambulances among the "vehicles" forbidden to enter the park. This mode of interpretation received its definitive statement in Blackstone's analysis of the medieval law of Bologna which stated that "whoever drew blood in the streets should be punished with the utmost severity." William Blackstone, *Commentaries on the Laws of England* *60 (1765). Blackstone asked whether the law should have been interpreted to make punishable a surgeon "who opened the vein of a person that fell down in the street with a fit." (Bleeding a sick or injured person was a common form of medical treatment in those days.) Blackstone thought not, remarking that as to "the effects and consequence, or the spirit and reason of the law … the rule is, where words bear either none, or a very absurd signification,

if literally understood, we must a little deviate from the received sense of them." *Id.* *59–60. The law didn't mention surgeons, but Blackstone thought it obvious that the legislators, who must have known something about the medical activities of surgeons, had not intended the law to apply to them. And so it is with ambulances in parks that prohibit vehicles.

Finally and most controversially, interpretation can mean giving a fresh meaning to a statement (which can be a statement found in a constitutional or statutory text)—a meaning that infuses the statement with vitality and significance today. An example of this last form of interpretation—the form that in my mind is most clearly applicable to the present case—is the Sherman Antitrust Act, enacted in 1890, long before there was a sophisticated understanding of the economics of monopoly and competition. Times have changed; and for more than thirty years the Act has been interpreted in conformity to the modern, not the nineteenth-century, understanding of the relevant economics. The Act has thus been updated by, or in the name of, judicial interpretation—the form of interpretation that consists of making old law satisfy modern needs and understandings. And a common form of interpretation it is, despite its flouting "original meaning." Statutes and constitutional provisions frequently are interpreted on the basis of present need and present understanding rather than original meaning—constitutional provisions even more frequently, because most of them are older than most statutes.

Title VII of the Civil Rights Act of 1964, now more than half a century old, invites an interpretation that will update it to the present, a present that differs markedly from the era

in which the Act was enacted. But I need to emphasize that this third form of interpretation—call it judicial interpretive updating—presupposes a lengthy interval between enactment and (re)interpretation. A statute when passed has an understood meaning; it takes years, often many years, for a shift in the political and cultural environment to change the understanding of the statute.

Hively, the plaintiff, claims that because she's a lesbian her employer declined to either promote her to full-time employment or renew her part-time employment contract. She seeks redress on the basis of the provision of Title VII that forbids an employer "to fail or refuse to hire[,] or to discharge[,] any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex … ." 42 U.S.C. § 2000e-2(a)(1).

The argument that firing a woman on account of her being a lesbian does *not* violate Title VII is that the term "sex" in the statute, when enacted in 1964, undoubtedly meant "man or woman," and so at the time people would have thought that a woman who was fired for being a lesbian was not being fired for being a woman unless her employer would not have fired on grounds of homosexuality a man he knew to be homosexual; for in that event the only difference between the two would be the gender of the one he fired. Title VII does not mention discrimination on the basis of sexual orientation, and so an explanation is needed for how 53 years later the meaning of the statute has changed and the word "sex" in it now connotes both gender *and* sexual orientation.

It is well-nigh certain that homosexuality, male or female, did not figure in the minds of the legislators who enacted Title VII. I had graduated from law school two years before the law was enacted. Had I been asked then whether I had ever met a male homosexual, I would have answered: probably not; had I been asked whether I had ever met a lesbian I would have answered "only in the pages of *À la recherche du temps perdu*." Homosexuality was almost invisible in the 1960s. It became visible in the 1980s as a consequence of the AIDS epidemic; today it is regarded by a large swathe of the American population as normal. But what is certain is that the word "sex" in Title VII had no immediate reference to homosexuality; many years would elapse before it could be understood to include homosexuality.

A diehard "originalist" would argue that what was believed in 1964 defines the scope of the statute for as long as the statutory text remains unchanged, and therefore until changed by Congress's amending or replacing the statute. But as I noted earlier, statutory and constitutional provisions frequently are interpreted on the basis of present need and understanding rather than original meaning. Think for example of Justice Scalia's decisive fifth vote to hold that burning the American flag as a political protest is protected by the free-speech clause of the First Amendment, provided that it's your flag and is not burned in circumstances in which the fire might spread. *Texas v. Johnson*, 491 U.S. 397 (1989); *United States v. Eichman*, 496 U.S. 310 (1990). Burning a flag is not speech in the usual sense and there is no indication that the framers or ratifiers of the First Amendment thought that the word "speech" in the amendment embraced flag burning or other nonverbal methods of communicating.

Or consider the Supreme Court's holding that the Fourth Amendment requires the issuance of a warrant as a precondition to searching a person's home or arresting him there. E.g., *Johnson v. United States*, 333 U.S. 10, 13–14 (1948). There is nothing in the amendment about requiring a warrant *ever*. All that the amendment says about warrants is that general warrants, and warrants that are vague or issued without probable cause, are invalid. In effect the Supreme Court rewrote the Fourth Amendment, just as it rewrote the First Amendment in the flag-burning cases, and just as it rewrote the Sherman Act, and just as today we are rewriting Title VII. We are Blackstone's heirs.

And there is more: think of how the term "cruel and unusual punishments" has morphed over time. Or how the Second Amendment, which as originally conceived and enacted was about arming the members of the state militias (now the National Guard), is today interpreted to confer gun rights on private citizens as well. Over and over again, old statutes, old constitutional provisions, are given new meaning, as explained so eloquently by Justice Holmes in *Missouri v. Holland*, 252 U.S. 416, 433–34 (1920):

> When we are dealing with words that also are a constituent act, like the Constitution of the United States, we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters. … The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago. The treaty in question does not contravene any prohibitory words to be found in the Constitution. The only question is whether it is forbidden by some invisible radiation from the general terms of the Tenth Amendment.

*We must consider what this country has become in deciding what that amendment has reserved* (emphasis added).

So by substituting Title VII for "that amendment" in Holmes's opinion, discrimination on grounds of "sex" in Title VII receives today a new, a broader, meaning. Nothing has changed more in the decades since the enactment of the statute than attitudes toward sex. 1964 was more than a decade before Richard Raskind underwent male-to-female sex reassignment surgery and took the name Renée Richards, becoming the first transgender celebrity; now of course transgender persons are common.

In 1964 (and indeed until the 2000s), and in some states until the Supreme Court's decision in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), men were not allowed to marry each other, nor women allowed to marry each other. If in those days an employer fired a lesbian because he didn't like lesbians, he would have said that he was not firing her because she was a woman—he would not have fired her had she been heterosexual—and so he was not discriminating on the basis of sex as understood by the authors and ratifiers of Title VII. But today "sex" has a broader meaning than the genitalia you're born with. In *Baskin v. Bogan*, 766 F.3d 648 (7th Cir. 2014), our court, anticipating *Obergefell* by invalidating laws in Indiana and Wisconsin that forbade same-sex marriage, discussed at length whether homosexual orientation is innate or chosen, and found that the scientific literature strongly supports the proposition that it is biological and innate, not a choice like deciding how to dress. The position of a woman discriminated against on account of being a lesbian is thus analogous to a woman's being discriminated against on account of being a woman. That woman didn't choose to

be a woman; the lesbian didn't choose to be a lesbian. I don't see why firing a lesbian because she is in the subset of women who are lesbian should be thought any less a form of sex discrimination than firing a woman because she's a woman.

But it has taken our courts and our society a considerable while to realize that sexual harassment, which has been pervasive in many workplaces (including many Capitol Hill offices and, notoriously, Fox News, among many other institutions), is a form of sex discrimination. It has taken a little longer for realization to dawn that discrimination based on a woman's failure to fulfill stereotypical gender roles is also a form of sex discrimination. And it has taken still longer, with a substantial volume of cases struggling and failing to maintain a plausible, defensible line between sex discrimination and sexual-orientation discrimination, to realize that homosexuality is nothing worse than failing to fulfill stereotypical gender roles.

It's true that even today if asked what is the sex of plaintiff Hively one would answer that she is female or that she is a woman, not that she is a lesbian. Lesbianism denotes a form of sexual or romantic attraction; it is not a physical sex identifier like masculinity or femininity. A broader understanding of the word "sex" in Title VII than the original understanding is thus required in order to be able to classify the discrimination of which Hively complains as a form of sex discrimination. That broader understanding is essential. Failure to adopt it would make the statute anachronistic, just as interpreting the Sherman Act by reference to its nineteenth-century framers' understanding of competition and monopoly would make the Sherman Act anachronistic.

We now understand that homosexual men and women (and also bisexuals, defined as having both homosexual and heterosexual orientations) are normal in the ways that count, and beyond that have made many outstanding intellectual and cultural contributions to society (think for example of Tchaikovsky, Oscar Wilde, Jane Addams, André Gide, Thomas Mann, Marlene Dietrich, Bayard Rustin, Alan Turing, Alec Guinness, Leonard Bernstein, Van Cliburn, and James Baldwin—a very partial list). We now understand that homosexuals, male and female, play an essential role, in this country at any rate, as adopters of children from foster homes—a point emphasized in our *Baskin* decision. The compelling social interest in protecting homosexuals (male and female) from discrimination justifies an admittedly loose "interpretation" of the word "sex" in Title VII to embrace homosexuality: an interpretation that cannot be imputed to the framers of the statute but that we are entitled to adopt in light of (to quote Holmes) "*what this country has become,*" or, in Blackstonian terminology, to embrace as a sensible deviation from the literal or original meaning of the statutory language.

I am reluctant however to base the new interpretation of discrimination on account of sex in Title VII on such cases as *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998), a case of sexual harassment of one man by other men, held by the Supreme Court to violate Title VII's prohibition of sex discrimination. The Court's opinion is rather evasive. I quote its critical language:

> As some courts have observed, male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII. But statutory prohibitions often go beyond the

> principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed. Title VII prohibits "discriminat[ion] … because of … sex" in the "terms" or "conditions" of employment. Our holding that this includes sexual harassment must extend to sexual harassment of any kind that meets the statutory requirements.

*Id.* at 79–80.

Consider the statement in the quotation that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately *the provisions of our laws* rather than the principal concerns of our legislators by which we are governed" (emphasis added). That could be thought "originalism," if by "provisions" is meant statutory language. Consider too the statement in *Oncale* that "Title VII prohibits 'discriminat[ion] … because of … sex' in the 'terms' or 'conditions' of employment. Our holding that this includes sexual harassment must extend to sexual harassment of any kind that meets the statutory requirements." Although "of any kind" signals breadth, it is narrowed by the clause that follows: "that meets the statutory requirements." So we're back to the essential issue in this case, which is whether passage of time and concomitant change in attitudes toward homosexuality and other unconventional forms of sexual orientation can justify a fresh interpretation of the phrase "discriminat[ion] … because of … sex" in Title VII, which fortunately however is a half-century-old statute ripe for reinterpretation.

Another decision we should avoid in ascribing present meaning to Title VII is *Loving v. Virginia*, 388 U.S. 1 (1967), which Hively argues protects her right to associate intimate-

ly with a person of the same sex. That was a constitutional case, based on race. It outlawed state prohibitions of interracial marriage. It had nothing to do with the recently enacted Title VII.

The majority opinion in the present case states that "Ivy Tech is disadvantaging [Hively] *because she is a woman*," not a man, who wants to have romantic attachments with female partners (emphasis in original). In other words, Ivy Tech is disadvantaging her because she is a woman who is not conforming to its notions of proper behavior. That's a different type of sex discrimination from the classic cases of old in which women were erroneously (sometimes maliciously) deemed unqualified for certain jobs. That was the basis on which fire departments, for example, discriminated against women—an example of discrimination plainly forbidden by the language of Title VII.

The most tenable and straightforward ground for deciding in favor of Hively is that while in 1964 sex discrimination meant discrimination against men or women as such and not against subsets of men or women such as effeminate men or mannish women, the concept of sex discrimination has since broadened in light of the recognition, which barely existed in 1964, that there are significant numbers of both men and women who have a sexual orientation that sets them apart from the heterosexual members of their genetic sex (male or female), and that while they constitute a minority their sexual orientation is not evil and does not threaten our society. Title VII in terms forbids only sex discrimination, but we now understand discrimination against homosexual men and women to be a form of sex discrimination; and to para-

phrase Holmes, "*We must consider what this country has be-come in deciding what that [statute] has reserved.*"

The majority opinion states that Congress in 1964 "may not have realized or understood the full scope of the words it chose." This could be understood to imply that the statute forbade discrimination against homosexuals but the framers and ratifiers of the statute were not smart enough to realize that. I would prefer to say that theirs was the then-current understanding of the key word—sex. "Sex" in 1964 meant gender, not sexual orientation. What the framers and ratifiers understandably didn't understand was how attitudes toward homosexuals would change in the following half century. They shouldn't be blamed for that failure of fore-sight. *We* understand the words of Title VII differently not because we're smarter than the statute's framers and ratifiers but because we live in a different era, a different culture. Congress in the 1960s did not foresee the sexual revolution of the 2000s. What our court announced in *Doe v. City of Belleville*, 119 F.3d 563, 572 (7th Cir. 1997), is what Congress had declared in 1964: "the traditional notion of 'sex.'"

I would prefer to see us acknowledge openly that today we, who are judges rather than members of Congress, are imposing on a half-century-old statute a meaning of "sex discrimination" that the Congress that enacted it would not have accepted. This is something courts do fairly frequently to avoid statutory obsolescence and concomitantly to avoid placing the entire burden of updating old statutes on the leg-islative branch. We should not leave the impression that we are merely the obedient servants of the 88th Congress (1963–1965), carrying out their wishes. We are not. We are taking advantage of what the last half century has taught.

FLAUM, *Circuit Judge*, joined by RIPPLE, *Circuit Judge*, concurring. I join Parts I and II of the majority opinion and agree that Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), does not preclude Professor Hively's claim that Ivy Tech Community College engaged in unlawful employment discrimination. I find the issue before us is simply whether discriminating against an employee for being homosexual violates Title VII's prohibition against discriminating against that employee because of their sex. In my view, the answer is yes, and the statute's text commands as much.

Kimberly Hively, who is openly lesbian, taught as a part-time, adjunct professor at Ivy Tech Community College. Over the course of her tenure, Professor Hively applied for full-time positions with the College, and it rejected each of her applications. After the College did not renew her contract, Professor Hively filed a *pro se* charge with the Equal Employment Opportunity Commission, alleging that Ivy Tech's refusal to promote her constituted discrimination "based on [her] sexual orientation." Ivy Tech denied having engaged in any discrimination and moved to dismiss Professor Hively's complaint for failing to state a claim on which relief could be granted. Throughout the course of this litigation, I understand the controlling question to have been the same: Does discrimination based on Professor Hively's "sexual orientation" constitute discrimination based on her "sex"? Under Title VII's text, it does.

Title VII provides:

> It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex[.]

42 U.S.C. § 2000e-2(a)(1). To prove her case, an employee "must show that the employer actually relied on her gender[1] in making its decision." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989).

Assuming the facts as pled are true, as we must at this stage of the litigation, Ivy Tech refused to promote Professor Hively because she is homosexual. Professor Hively argues that, in doing so, the College relied on her sex, because, but for her sex, she would not have been denied a promotion (*i.e.*, she would not have been denied a promotion if she were a *man* who was sexually attracted to women). She also argues that Ivy Tech's actions constituted associational discrimination: The College took issue with Professor Hively's intimate association with women and refused to promote her. There is no allegation, however, that the College refused to promote women; nor is there an allegation that it refused to promote those who associate with women. Rather, Ivy Tech's alleged animus was against Professor Hively's sexual orientation—a combination of these two factors—which the College argues is not a trait enumerated in Title VII.

Setting aside the treatment in the majority and dissenting opinions of sexual orientation as a freestanding concept, I

---

[1] As the majority notes, the Supreme Court has often treated "gender" and "sex" as synonymous. I agree that there is no need to inquire whether they are the same for legal purposes in this case.

conclude discrimination against an employee on the basis of their homosexuality is necessarily, in part, discrimination based on their sex. Fundamental to the definition of homosexuality is the sexual attraction to individuals of the "same sex." *Homosexual*, Merriam-Webster Dictionary Online, *available at* https://www.merriam-webster.com/dictionary/homosexual ("[O]f, relating to, or characterized by a tendency to direct sexual desire toward another of the *same sex*") (emphasis added) (last visited April 4, 2017); *see also Homosexual*, Black's Law Dictionary (10th ed. 2014) ("Of relating to, or characterized by sexual desire for a person of the *same sex*.") (emphasis added); *Homosexual*, Oxford English Dictionary (5th ed. 1964) ("Having a sexual propensity for persons of one's *own sex*.") (emphasis added). One cannot consider a person's homosexuality without also accounting for their sex: doing so would render "same" and "own" meaningless. As such, discriminating against that employee because they are homosexual constitutes discriminating against an employee because of (A) the employee's sex, *and* (B) their sexual attraction to individuals of the *same sex*. And "sex," under Title VII, is an enumerated trait.

This raises the question: Does Title VII's text require a plaintiff to show that an employer discriminated against them *solely* "because of" an enumerated trait? Again, I turn to the text, which clearly states:

> Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that … sex … was *a motivating factor for any employment practice, even though other factors also motivated the practice*.

42 U.S.C. § 2000e-2(m) (emphasis added). Congress added this amendment to Title VII partially in response to the Supreme Court's plurality decision in *Hopkins*, in which the Court stated:

> [S]ince we know that the words "because of" do not mean "*solely* because of," we also know that Title VII meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations. When, therefore, an employer considers both gender and legitimate factors at the time of making a decision, that decision was "because of" sex and the other, legitimate considerations….We need not leave our common sense at the doorstep when we interpret a statute. It is difficult for us to imagine that, in the simple words "because of," Congress meant to obligate a plaintiff to identify the precise causal role played by legitimate and illegitimate motivations in the employment decision she challenges. We conclude, instead, that Congress meant to obligate her to prove that the employer relied upon sex-based considerations in coming to its decision.

490 U.S. at 241–242 (footnote omitted). The Court made clear that "[t]he critical inquiry … is whether gender was *a factor* in the employment decision" when it was made. *Id*. at 241 (emphasis added). So if discriminating against an employee because she is homosexual is equivalent to discriminating against her because she is (A) a woman who is (B) sexually

attracted to women, then it is motivated, in part, by an enumerated trait: the employee's sex. That is all an employee must show to successfully allege a Title VII claim.[2]

Cases analyzing employment actions based on interracial relationships provide an apt illustration. Although this Circuit has not yet addressed whether claims based on a theory of associational discrimination are cognizable under Title VII, I agree with the majority that the Second Circuit's analysis in *Holcomb v. Iona College*, 521 F.3d 130 (2d Cir. 2008), is persuasive. There, the court concluded that the college had violated Title VII after firing a white basketball coach because of his marriage to a black woman. The court explained, "[W]here an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's *own* race." *Id*. at 139. This comports with Title VII's text. Interracial relationships are comprised of (A) an individual of one race, and (B) another individual of a *different race*. Without considering the first individual's race, the word "different" is meaningless.

---

[2] The foregoing analysis should obtain even if an employer allegedly discriminates against all homosexual employees. In that case, the employer's discrimination across sexes does not demonstrate that sex is irrelevant, but rather that each individual has a plausible sex-based discrimination claim. *See City of Los Angeles, Dep't of Water and Power v. Manhart*, 435 U.S. 702, 708 (1978) ("[Title VII] makes it unlawful 'to discriminate against any *individual* … because of such *individual's* … sex[.]' The statute's focus on the individual is unambiguous." (quoting 42 U.S.C. § 2000e-2(a)(1))). When confronting claims that are inherently based in part on sex, such as discrimination against homosexuals, each employee's claim satisfies Title VII on its face, no matter the sex of any other employee who experienced discrimination.

Consequently, employment discrimination based on an employee's interracial relationship is, in part, tied to an enumerated trait: the employee's race. This type of discrimination is prohibited by Title VII.

The same principle applies here. Ivy Tech allegedly refused to promote Professor Hively because she was homosexual—or (A) a woman who is (B) sexually attracted to women. Thus, the College allegedly discriminated against Professor Hively, at least in part, because of her sex. I conclude that Title VII, as its text provides, does not allow this.

SYKES, *Circuit Judge*, with whom BAUER and KANNE, *Circuit Judges*, join, dissenting. Any case heard by the full court is important. This one is momentous. All the more reason to pay careful attention to the limits on the court's role. The question before the en banc court is one of statutory interpretation. The majority deploys a judge-empowering, common-law decision method that leaves a great deal of room for judicial discretion. So does Judge Posner in his concurrence. Neither is faithful to the statutory text, read fairly, as a reasonable person would have understood it when it was adopted. The result is a statutory amendment courtesy of unelected judges. Judge Posner admits this; he embraces and argues for this conception of judicial power. The majority does not, preferring instead to smuggle in the statutory amendment under cover of an aggressive reading of loosely related Supreme Court precedents. Either way, the result is the same: the circumvention of the legislative process by which the people govern themselves.

Respect for the constraints imposed on the judiciary by a system of written law must begin with fidelity to the traditional first principle of statutory interpretation: When a statute supplies the rule of decision, our role is to give effect to the enacted text, interpreting the statutory language as a reasonable person would have understood it at the time of enactment. We are not authorized to infuse the text with a new or unconventional meaning or to update it to respond to changed social, economic, or political conditions.

In a handful of statutory contexts, Congress has vested the federal courts with authority to consider and make new rules of law in the common-law way. The Sherman Act is the archetype of the so-called "common-law statutes," but there

are very few of these and Title VII is not one of them. *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO,* 451 U.S. 77, 95–97 (1981); *id.* at 98 n.42. So our role is interpretive only; we lack the discretion to ascribe to Title VII a meaning it did not bear at its inception. Sitting en banc permits us to overturn our own precedents, but in a statutory case, we do not sit as a common-law court free to engage in "judicial interpretive updating," as Judge Posner calls it,[1] or to do the same thing by pressing hard on tenuously related Supreme Court opinions, as the majority does.

Judicial statutory updating, whether overt or covert, cannot be reconciled with the constitutional design. The Constitution establishes a procedure for enacting and amending statutes: bicameralism and presentment. *See* U.S. CONST. art. I, § 7. Needless to say, statutory amendments brought to you by the judiciary do not pass through this process. That is why a textualist decision method matters: When we assume the power to alter the original public meaning of a statute through the process of interpretation, we assume a power that is not ours. The Constitution assigns the power to make and amend statutory law to the elected representatives of the people. However welcome today's decision might be as a policy matter, it comes at a great cost to representative self-government.

## I

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any

---

[1] He describes this method of statutory interpretation throughout his opinion and gives it the name "judicial interpretive updating" on page 27.

individual, or otherwise to discriminate against any individual … because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Sexual orientation is not on the list of forbidden categories of employment discrimination, and we have long and consistently held that employment decisions based on a person's sexual orientation do not classify people on the basis of sex and thus are not covered by Title VII's prohibition of discrimination "because of sex." *Hamm v. Weyauwega Milk Prods., Inc.*, 332 F.3d 1058, 1062 (7th Cir. 2003); *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1085 (7th Cir. 2000); *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 704 (7th Cir. 2000); *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir. 1984). This interpretation has been stable for many decades and is broadly accepted; all circuits agree that sexual-orientation discrimination is a distinct form of discrimination and is not synonymous with sex discrimination. *See* Majority Op. at pp. 3–4 (collecting cases).

Today the court jettisons the prevailing interpretation and installs the polar opposite. Suddenly sexual-orientation discrimination *is* sex discrimination and thus is actionable under Title VII. What justification is offered for this radical change in a well-established, uniform interpretation of an important—indeed, transformational—statute? My colleagues take note of the Supreme Court's "absence from the debate." *Id.* at p. 4. What debate? There is no debate, at least not in the relevant sense. Our long-standing interpretation of Title VII is not an outlier. From the statute's inception to the present day, the appellate courts have unanimously and repeatedly read the statute the same way, as my colleagues must and do acknowledge. *Id.* at pp. 3–4. The Supreme Court has had no need to weigh in, and the unanimity

among the courts of appeals strongly suggests that our long-settled interpretation is correct.

Of course there *is* a robust debate on this subject in our culture, media, and politics. Attitudes about gay rights have dramatically shifted in the 53 years since the Civil Rights Act was adopted. Lambda Legal's proposed new reading of Title VII—offered on behalf of plaintiff Kimberly Hively at the appellate stage of this litigation—has a strong foothold in current popular opinion.

This striking cultural change informs a case for legislative change and might eventually persuade the people's representatives to amend the statute to implement a new public policy. But it does not bear on the sole inquiry properly before the en banc court: Is the prevailing interpretation of Title VII—that discrimination on the basis of sexual orientation is different in kind and not a form of sex discrimination—*wrong as an original matter*?

A

On that question Lambda Legal has not carried its burden of legal persuasion. To be clear, I agree with my colleagues that the proposed new interpretation is not necessarily incorrect simply because no one in the 1964 Congress that adopted Title VII intended or anticipated its application to sexual-orientation discrimination. The subjective intentions of the legislators do not matter. Statutory interpretation is an objective inquiry that looks for the meaning the statutory language conveyed to a reasonable person at the time of enactment. The objective meaning of the text is not delimited by what individual lawmakers specifically had in mind when they voted for the statute. The Supreme Court made

this point clear in *Oncale* when it said that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). Broadly worded statutes are regularly applied to circumstances beyond the subjective contemplation of the lawmakers who adopted the text.

That much is uncontroversial. Indeed, it derives from a foundational rule-of-law principle:

> [I]t is simply incompatible with democratic government, or indeed, even with fair government, to have the meaning of a law determined by what the lawgiver meant, rather than by what the lawgiver promulgated. … [Ours is a] government of laws, not of men. Men may intend what they will; but it is only the laws that they enact which bind us.

ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 17 (Amy Gutmann ed., 1997).

So as a matter of interpretive method, I agree with my colleagues that the scope of Title VII is not limited by the subjective intentions of the enacting legislators. Or as Chief Judge Wood puts it in her elegant opinion for the en banc majority, the expectations of the enacting legislators "cannot stand in the way of the provisions of the law that are on the books."[2] Majority Op. at p. 10.

---

[2] Like my colleagues, I too decline to defer to the EEOC's decision in *Baldwin v. Foxx*, EEOC Appeal No. 0120133080, 2015 WL 4397641 (July 15, 2015). Majority Op. at pp. 8–9. This is not a case about agency deference.

B

That is where our agreement ends. The en banc majority rests its new interpretation of sex discrimination on a thought experiment drawn from the "tried-and-true" comparative method of proof often used by plaintiffs in discrimination cases. *Id.* at p. 11. The majority also invokes *Loving v. Virginia*, 388 U.S. 1 (1967), the Supreme Court's historic decision striking down Virginia's miscegenation laws under the Fourteenth Amendment's Equal Protection Clause, as well as cases involving sex stereotyping, most prominently *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

But the analysis must begin with the statutory text; it largely ends there too. Is it even remotely plausible that in 1964, when Title VII was adopted, a reasonable person competent in the English language would have understood that a law banning employment discrimination "because of sex" also banned discrimination because of sexual orientation? The answer is no, of course not.

"It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 134 S. Ct. 870, 876 (2014) (internal quotation marks omitted). The word "contemporary" as used here means *contemporaneous with the statute's enactment*, not "contemporary" as in "now." *Id.* at 876–77; *see also Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860, 863 (7th Cir. 2016) (citing *Sandifer* and explaining that statutory interpretation "look[s] to the meaning of the word[s] at the time the statute was enacted"). The interpretive inquiry looks to the original public meaning of the statutory text.

Title VII does not define discrimination "because of sex." In common, ordinary usage in 1964—and now, for that matter—the word "sex" means biologically *male* or *female*; it does not also refer to sexual orientation. *See, e.g.*, *Sex*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1st ed. 1969) (defining "sex" as "[t]he property or quality by which organisms are classified according to their reproductive functions[;] [e]ither of two divisions, designated *male* and *female*, of this classification"); *Sex*, NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010) (defining "sex" as "either of the two main categories (male and female) into which humans and many other living things are divided on the basis of their reproductive functions"); *Sex*, THE AMERICAN HERITAGE DESK DICTIONARY (5th ed. 2013) (defining "sex" as "[e]ither of the two divisions, female and male, by which most organisms are classified on the basis of their reproductive organs and functions[;] [t]he condition or character of being female or male").

To a fluent speaker of the English language—then and now—the ordinary meaning of the word "sex" does not fairly include the concept of "sexual orientation."[3] The two terms are never used interchangeably, and the latter is not subsumed within the former; there is no overlap in meaning. Contrary to the majority's vivid rhetorical claim, it does not

[3] The term "sexual orientation" does not appear in dictionaries at or around the time of Title VII's enactment. According to the current definition, it is not synonymous with "sex." *Sexual Orientation*, OXFORD ENGLISH DICTIONARY (2009 ed.) ("Originally: (the process of) orientation with respect to a sexual goal, potential mate, partner, etc. Later chiefly: a person's sexual identity in relation to the gender to whom he or she is usually attracted; (broadly) the fact of being heterosexual, bisexual, or homosexual.").

take "considerable calisthenics" to separate the two. Majority Op. at p. 20. The words plainly describe different traits, and the separate and distinct meaning of each term is easily grasped. More specifically to the point here, discrimination "because of sex" is not reasonably understood to include discrimination based on sexual orientation, a different immutable characteristic. Classifying people by sexual orientation is different than classifying them by sex. The two traits are categorically distinct and widely recognized as such. There is no ambiguity or vagueness here.

Accordingly, as we said more than three decades ago in *Ulane*, Title VII's prohibition of discrimination "because of sex" makes it unlawful for an employer "to discriminate against women because they are women and against men because they are men." 742 F.2d at 1085. Because sexual-orientation discrimination is not synonymous with sex discrimination in ordinary usage, Title VII does not prohibit sexual-orientation discrimination. Not expressly (obviously), and not by fair implication either.

## C

This commonsense understanding is confirmed by the language Congress uses when it *does* legislate against sexual-orientation discrimination. For example, the Violence Against Women Act prohibits funded programs and activities from discriminating "on the basis of actual or perceived race, color, religion, national origin, *sex*, gender identity, … *sexual orientation*, or disability." 42 U.S.C. § 13925(b)(13)(A) (emphases added). If sex discrimination is commonly understood to encompass sexual-orientation discrimination, then listing the two categories separately, as this statute does, is needless surplusage. The federal Hate Crimes Act is another

example. It imposes a heightened punishment for causing or attempting to cause bodily injury "to any person, because of the actual or perceived religion, national origin, *gender*, *sexual orientation*, gender identity, or disability of any person." 18 U.S.C. § 249(a)(2)(A) (emphases added).[4]

Other examples can be found elsewhere in the U.S. Code. *See, e.g.*, 42 U.S.C. § 3716(a)(1)(C) (providing federal assistance to state and local authorities for the investigation and prosecution of certain crimes "motivated by prejudice based on the actual or perceived race, color, religion, national origin, *gender*, *sexual orientation*, gender identity, or disability of the victim") (emphases added); 20 U.S.C. § 1092(f)(1)(F)(ii) (requiring colleges and universities to collect and report information regarding crimes on campus, including "crimes involving bodily injury to any person, in which the victim is intentionally selected because of the actual or perceived race, *gender*, religion, national origin, *sexual orientation*, gender identity, ethnicity, or disability of the victim") (emphases added); 42 U.S.C. 294e-1(b)(2) (requiring applicants for a federal mental-health education-grant program to demonstrate participation "of individuals and groups from different racial, ethnic, cultural, geographic, religious, linguistic, and class backgrounds, and *different genders* and *sexual orientations*") (emphases added).

State and local antidiscrimination laws likewise distinguish between sex discrimination and sexual-orientation discrimination by listing them separately as distinct forms of

---

[4] A different subsection of the hate-crimes law imposes the same heightened penalty for causing or attempting to cause bodily injury because of a person's race. 18 U.S.C. § 249(a)(1).

unlawful discrimination. *See, e.g.*, Illinois Human Rights Act, 775 ILL. COMP. STAT. 5/1-103(Q) (defining "unlawful discrimination" as "discrimination against a person because of his or her race, color, religion, national origin, ancestry, age, *sex*, marital status, order of protection status, disability, military status, *sexual orientation*, pregnancy, or unfavorable discharge from military service") (emphases added); Iowa Civil Rights Act, IOWA CODE § 216.7(1)(a) (prohibiting discrimination in public accommodations "because of race, creed, color, *sex*, *sexual orientation*, gender identity, national origin, religion, or disability") (emphases added); WIS. STAT. § 106.52(3) (using similar language to prohibit discrimination in public accommodations); Minnesota Human Rights Act, MINN. STAT. § 363A.11(1)(a)(1) (same); OR. REV. STAT. § 659A.403(1) (same); Washington Civil Rights Act, WASH. REV. CODE § 49.60.030(1) (declaring as a civil right the "right to be free from discrimination because of race, creed, color, national origin, *sex*, honorably discharged veteran or military status, *sexual orientation*, or the presence of any … disability") (emphases added); D.C. CODE § 2-1402.31(a) (forbidding certain forms of discrimination "based on the actual or perceived: race, color, religion, national origin, *sex*, age, … [or] *sexual orientation* … of any individual") (emphases added); BLOOMINGTON, IND., CODE § 2.21.030(10) (defining a "discriminatory practice" as "the exclusion of a person by another person from equal opportunities because of race, religion, color, *sex*, national origin, ancestry, *sexual orientation*, gender identity, disability, housing status or status as a veteran") (emphases added); INDIANAPOLIS, IND., CODE § 581-101 (defining prohibited "discriminatory practices" to include denying employment and educational opportunity, access to public accommodations, and acquisition of real

estate "based on race, color, religion, ancestry, age, national origin, disability, *sex*, *sexual orientation*, gender identity, or United States military service veteran status") (emphases added).

I could go on, but the point has been made. This uniformity of usage is powerful objective evidence that sexual-orientation discrimination is broadly recognized as an independent category of discrimination and is *not* synonymous with sex discrimination.

## II

My colleagues in the majority superficially acknowledge *Ulane*'s "truism" that sex discrimination is discrimination based on a person's biological sex. Majority Op. at p. 3. As they see it, however, even if sex discrimination is understood in the ordinary way, sexual-orientation discrimination *is* sex discrimination because "it is actually impossible to discriminate on the basis of sexual orientation without discriminating on the basis of sex." *Id.* at p. 22.

Not true. An employer who refuses to hire homosexuals is not drawing a line based on the job applicant's sex. He is not excluding gay men because they are men and lesbians because they are women. His discriminatory motivation is independent of and unrelated to the applicant's sex. Sexism (misandry and misogyny) and homophobia are separate kinds of prejudice that classify people in distinct ways based on different immutable characteristics. Simply put, sexual-orientation discrimination doesn't classify people by sex; it doesn't draw male/female distinctions but instead targets homosexual men and women for harsher treatment than heterosexual men and women.

The majority opinion merges these two distinct categories of discrimination by misapplying the comparative method of proof often used by plaintiffs in discrimination cases. As a threshold matter, it's important to note that as used here, the comparative method is not serving its usual and intended purpose; it is not invoked as a *method of proof* or a technique for evaluating the sufficiency of the plaintiff's allegations or evidence. That's because Hively has not, of course, raised a claim of sex discrimination. She does not allege that Ivy Tech refused to promote her to full-time professor and canceled her part-time teaching contract *because of her sex*; she does not claim that she was treated differently than a similarly situated man. She alleges that Ivy Tech took these adverse actions against her because she is a lesbian, *not* because she is a woman. So the majority's discussion of what Hively "alleges," *id.* at p. 11, followed by an incantation of the Rule 12(b)(6) standard for evaluating the sufficiency of the plaintiff's factual allegations ("[w]e take the facts in the light most favorable to her"), *id.*, is seriously misleading.

This appeal has nothing to do with Hively's factual allegations. We have only a legal question about the meaning of Title VII. Lambda Legal is advancing a creative new *legal* argument for *reinterpreting* Title VII, deploying the comparative method not as a method of proof (its normal and intended function) but as a thought experiment with the end of imbuing the statute with a new meaning that it did not bear at its inception.

This highlights a deeper problem with the court's comparative analysis. The purpose of the comparative method is to isolate whether a statutorily forbidden motivation is at

work *as a factual matter*—in a sex-discrimination case, to isolate whether the defendant employer took a particular adverse employment action against a particular female employee because she is a woman or against a particular male employee because he is a man. Title VII's "intentional discrimination provision prohibits certain *motives*" for taking adverse job actions, *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015), so as a required factual element of the claim, the plaintiff must prove that the employer actually acted with the intent or motive to discriminate on the basis of a statutorily protected trait when he made the employment decision in question, *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (citing *Watson v. Forth Worth Bank & Tr.*, 487 U.S. 977, 986 (1988)).

The comparative method of proof is a useful technique for uncovering the employer's real motive for taking the challenged action. Comparing the plaintiff to a similarly situated employee of the opposite sex can help the fact finder determine whether the employer was actually motivated by the plaintiff's sex or acted for some other reason. It's a device for ferreting out a prohibited discriminatory motive as an actual cause of the adverse employment action; it does this by controlling for other possible motives. If a female plaintiff can point to a male employee who is identical to her in every material respect and was treated more favorably, then the fact finder can draw an inference that the unfavorable treatment was actually motivated by the plaintiff's sex.

Here the majority is not using the comparative method to isolate whether Ivy Tech was *actually* motivated by Hively's sex when it refused to promote her to full-time professor and canceled her part-time teaching contract. To repeat, Hively

does not make that allegation. Her factual claim is that Ivy Tech refused to promote her and canceled her contract because she is a lesbian. The only question for us is whether *that* claim—her *real* claim—is actionable under Title VII *as a matter of law*. That's a pure question of statutory interpretation.

But the comparative method of proof is an evidentiary test; it is not an interpretive tool. It tells us *nothing* about the meaning or scope of Title VII. In ordinary English usage, sexual-orientation discrimination is a distinct form of discrimination and is not synonymous with sex discrimination. That's the plain meaning of Title VII's text as originally understood. An *evidentiary test* like the comparative method of proof has no work to do here and is utterly out of place.

Moreover, the majority distorts the comparative method by opportunistically framing the comparison. If the aim is to isolate actual discriminatory motive based on the plaintiff's sex, then we must hold everything constant *except* the plaintiff's sex. But my colleagues load the dice by changing *two* variables—the plaintiff's sex *and* sexual orientation—to arrive at the hypothetical comparator. The court's reasoning essentially distills to this: If we compare Hively, a homosexual woman, to hypothetical Professor A, a heterosexual man, we can see that Ivy Tech is actually disadvantaging Hively because she is a woman. Majority Op. at pp. 11–12.

As a test for isolating an *actual* case of *sex* discrimination, that way of framing the comparative question doesn't do the trick. Simply put, the comparison can't do its job of *ruling in* sex discrimination as the actual reason for the employer's decision (by *ruling out* other possible motivations) if we're not scrupulous about holding *everything* constant except the

plaintiff's sex. That includes the plaintiff's sexual orientation. If we're really serious about trying to isolate whether sex discrimination played a role in a specific employment decision, the test must exclude other factors that may have been decisive.

For the comparison to be valid as a test for the role of sex discrimination in this employment decision, the proper comparison is to ask how Ivy Tech treated qualified gay men. If an employer is willing to hire gay men but not lesbians, then the comparative method has exposed an actual case of sex discrimination. If, on the other hand, an employer hires only heterosexual men and women and rejects all homosexual applicants, then no inference of sex discrimination is possible, though we could perhaps draw an inference of sexual-orientation discrimination.

But of course my colleagues are not actually trying to isolate sex discrimination as the *real* motivation for Ivy Tech's decision. They are not, that is, testing for a *true* case of sex discrimination. They are using the comparative method as a rhetorical device to conjure an entirely new understanding of the term "sex discrimination" for use in the Title VII context, one that denies the reality that sex and sexual orientation are different traits and that classifying people by sexual orientation is not the same as classifying them by sex. This is artifice, not interpretation.

My colleagues insist that "[t]he virtue of looking at comparators … is that this process sheds light on the interpretive question raised by Hively's case: is sexual-orientation discrimination a form of sex discrimination, given the way in which the Supreme Court has interpreted the word 'sex' in the statute?" Majority Op. at p. 14. I have two responses.

First, at the risk of repeating myself, the point of "looking at comparators" in Title VII cases is to see if the evidentiary record permits a *factual* inference of *actual* discriminatory motive; the comparative method has no *interpretive* function. Second, the Supreme Court has never deployed an abstract version of the comparative method of proof to illuminate the original meaning or scope of Title VII, nor has it even *hinted* that such an abstraction is a proper interpretive tool. For good reason. Ordinary people do not use abstract thought experiments to ascribe meaning to texts.[5]

---

[5] Judge Flaum's concurrence offers a somewhat different way to think about sexual-orientation discrimination: "Fundamental to the definition of homosexuality is the sexual attraction to individuals of the 'same sex.'… One cannot consider a person's homosexuality without also accounting for their sex: doing so would render 'same' … meaningless." Flaum, J., concurring, at p. 37. But an employer who categorically won't hire homosexuals is not "accounting for" a job applicant's sex in the sense meant by antidiscrimination law; a hiring policy of "no homosexuals need apply" is gender blind. The next sentence in the analysis likewise doesn't follow: "As such, discriminating against that employee because they are homosexual constitutes discriminating against an employee because of (A) the employee's sex, *and* (B) their sexual attraction to individuals of the *same sex*." *Id.* Part (B) is true; part (A) is not. An employer who refuses to hire a lesbian applicant because she is a lesbian only "accounts for" her sex in the limited sense that he notices she is a woman. But that's not the object of the employer's discriminatory intent, not even in part. Her sex isn't a motivating factor for the employer's decision; the employer objects only to her sexual orientation. This attempt to conceptually split homosexuality into two parts—a person's sex and his or her sexual attraction to persons of the same sex—doesn't make sexual-orientation discrimination actionable as sex discrimination.

### III

### A

The majority also draws on *Loving*, the Supreme Court's iconic decision invalidating Virginia's miscegenation statutes on equal-protection grounds. This case is not a variant of *Loving*. Miscegenation laws plainly employ invidious racial classifications; they are inherently racially discriminatory. In contrast, sexual-orientation discrimination springs from a wholly different kind of bias than sex discrimination. The two forms of discrimination classify people based on different traits and thus are not the same.

In *Loving*, Virginia tried to defend its antimiscegenation regime by insisting that miscegenation statutes do not actually discriminate based on race because both the black and white spouses in an interracial marriage are punished equally. 388 U.S. at 8 ("[T]he State contends that, because its miscegenation statutes punish equally both the white and the Negro participants in an interracial marriage, these statutes, despite their reliance on racial classifications[,] do not constitute an invidious discrimination based upon race."). The Supreme Court made short work of that specious argument: "[W]e deal [here] with statutes containing racial classifications, and the fact of equal application does not immunize the statute[s] from the very heavy burden of justification which the Fourteenth Amendment has traditionally required of state statutes drawn according to race." *Id.* at 9.

The Court went on to explain that the "clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the

States." *Id.* at 10. The Court continued with this: "There can be no question but that Virginia's miscegenation statutes rest solely upon distinctions drawn according to race. The statutes proscribe generally accepted conduct if engaged in by members of different races." *Id.* at 11. After explaining that the "[p]enalties for miscegenation arose as an incident to slavery," *id.* at 6, and are "designed to maintain White Supremacy,"[6] *id.* at 11, the Court announced its holding: "There can be no doubt that restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause," *id.* at 12.

As these passages from the Court's opinion make clear, *Loving* rests on the inescapable truth that miscegenation laws are inherently racist. They are premised on invidious ideas about white superiority and use racial classifications toward the end of racial purity and white supremacy. Sexual-orientation discrimination, on the other hand, is not inherently *sexist*. No one argues that sexual-orientation discrimination aims to promote or perpetuate the supremacy of one sex. In short, *Loving* neither compels nor supports the majority's decision to upend the long-settled understanding that sex discrimination and sexual-orientation discrimination are distinct.

---

[6] Virginia's highest court had identified what it said were the state's "legitimate purposes" for its miscegenation laws: "'to preserve the racial integrity of [the state's] citizens,' and to prevent 'the corruption of blood,' 'a mongrel breed of citizens,' and 'the obliteration of racial pride.'" *Loving v. Virginia*, 388 U.S. 1, 7 (1967) (quoting *Naim v. Naim*, 87 S.E.2d 749, 756 (1955)). This, the Supreme Court said, was "obviously an endorsement of the doctrine of White Supremacy." *Id.*

For the same reason, the majority's reliance on *Parr*, *Holcomb*, and *Drake*, which translated *Loving* to the Title VII context, is entirely inapt. An employer who refuses to hire or fires an employee based on his interracial marriage is obviously drawing invidious racial classifications akin to those inherent in Virginia's miscegenation laws. *Loving*'s equal-protection holding extends to Title VII racial-discrimination claims because those claims share the same contextual foundation. They arise in a nation whose original sin is slavery, where some states sought to perpetuate white supremacy as recently as a half century ago, and where the vestiges of this iniquitous history persist in our workplaces and in other institutions of our society. The Equal Protection Clause and Title VII's prohibition of racial discrimination in the workplace *both* operate to curtail the evil of racism inherent in antimiscegenation. That explains why *Loving* applies to Title VII racial-discrimination claims but is not a warrant for reading sexual-orientation discrimination into the statute.

B

The majority also relies on cases involving sex stereotyping, most notably the Supreme Court's decision in *Price Waterhouse v. Hopkins*. More specifically, my colleagues conclude that a claim of sexual-orientation discrimination is indistinguishable from a claim involving sex stereotyping. Majority Op. at pp. 12–15. I disagree. Nothing in *Hopkins* altered the traditional understanding that sexual-orientation discrimination is a distinct type of discrimination and is not synonymous with sex discrimination.

As a preliminary matter, neither *Hopkins* nor any other decision of the Supreme Court establishes an independent

cause of action for, or "doctrine" or "theory" of, "sex stereo-typing."[7] *Hopkins* held only that the presence of sex stereo-typing by an employer "can certainly be *evidence*" of sex discrimination; to prove her case, the plaintiff must always prove that "the employer *actually* relied on her gender in making its decision." 490 U.S. at 251 (second emphasis added).

It's also often overlooked that the lead opinion in *Hopkins* was a four-Justice plurality, not a majority opinion. *Id.* at 231. Two Justices concurred in the judgment only, and they said nothing about sex stereotyping as a "theory" of sex discrim-ination. *Id.* at 258–61 (White, J., concurring in the judgment); *id.* at 261–79 (O'Connor, J., concurring in the judgment). Here's another point that's often missed: Although the facts in *Hopkins* involved sex stereotyping, the actual legal issue dealt with the allocation of burdens of proof on the element of causation in a mixed-motives Title VII case. The plurality opinion made that clear in its very first paragraph: "We granted certiorari to resolve a conflict among the Courts of Appeals concerning the respective burdens of proof of a defendant and plaintiff in a suit under Title VII when it has been shown that an employment decision resulted from a mixture of legitimate and illegitimate motives." *Id.* at 232. The plurality devised a burden-shifting approach for use in mixed-motive cases. *Id.* at 258. Justices White and O'Connor concurred in the judgment, each filing a separate opinion agreeing with the burden-shifting method but taking issue with the plurality's discussion of the substantive standard of

---

[7] Some lower courts use the phrase "gender nonconformity" inter-changeably with "sex stereotyping," but the Supreme Court has never used that term.

causation. *Id.* at 258–61 (White, J., concurring in the judgment); *id.* at 261–79 (O'Connor, J., concurring in the judgment).

Only a very short passage in the very long plurality opinion actually addresses the subject of sex stereotyping. The plurality simply accepted the district court's factual finding that sex stereotyping played a role in Price Waterhouse's decision to place Ann Hopkins's bid for partnership on hold. *Id.* at 236–37 (describing the trial judge's factual findings); *see also id.* at 251 ("As to the existence of sex stereotyping in this case, we are not inclined to quarrel with the District Court's conclusion that a number of the partners' comments showed sex stereotyping at work."). Regarding the *legal* significance of sex stereotyping as evidence of sex discrimination, the plurality had only this to say:

> In saying that gender played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was a woman. In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender.
>
> … .
>
> As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or in-

sisting that they matched the stereotype asso-
ciated with their group, for "'[i]n forbidding
employers to discriminate against individuals
because of their sex, Congress intended to
strike at the entire spectrum of disparate
treatment of men and women resulting from
sex stereotypes.'" *Los Angeles Dept. of Water and
Power v. Manhart*, 435 U.S. 702, 707, n.13 (1978),
quoting *Sprogis v. United Air Lines, Inc.*, 444 F.2d
1194, 1198 (7th Cir. 1971). An employer who
objects to aggressiveness in women but whose
positions require this trait places women in an
intolerable and impermissible catch 22; out of a
job if they behave aggressively and out of a job
if they do not. Title VII lifts women out of this
bind.

*Id.* at 250–51 (footnote omitted). Nothing in this passage
casts any doubt on the settled, long-understood distinction
between sex discrimination and sexual-orientation discrimi-
nation.[8]

---

[8] The two cases cited in this passage of the plurality opinion were
straightforward cases of sex discrimination. *Manhart* was a challenge to
an employer's policy that required female employees to make larger
contributions to the employee pension fund than male employees. *City of
L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702, 704–06 (1978). The
Court noted that the employer's policy was not based on sex stereotypes
but rested on actuarial generalizations that "the parties accept as unques-
tionably true: Women, as a class, do live longer than men." *Id.* at 707.
Still, the Court held that requiring women to pay more into the fund
than men was a plain case of sex discrimination. *Id.* at 707–10.

   *Sprogis* was a challenge to an airline's rule that female flight attend-
ants, but not male flight attendants, must be unmarried. *Sprogis v. United*

To put the matter plainly, heterosexuality is not a *female* stereotype; it is not a *male* stereotype; it is not a *sex-specific* stereotype at all. An employer who hires only heterosexual employees is neither assuming nor insisting that his female and male employees match a stereotype specific to their sex. He is instead insisting that his employees match the dominant sexual orientation *regardless of their sex*. Sexual-orientation discrimination does not classify people according to invidious or idiosyncratic *male* or *female* stereotypes. It does not spring from a sex-specific bias at all.

The point is easy to see if we take the question posed by the plurality opinion in *Hopkins* and map it onto this case. Hively suspects that the real reason Ivy Tech rejected her repeated applications for promotion is her sexual orientation. Assume for the moment that her suspicion is correct. If we asked Ivy Tech "at the moment of the decision what its reasons were and if we received a truthful response," *id.* at 250, would it be reasonable to expect Ivy Tech to respond that it rejected her applications because she is a woman? No. If Ivy Tech responded truthfully, it would confess that its decisions were based on Hively's sexual orientation, not her sex.

So it's a serious mistake to think that *Hopkins* either supports or requires a new interpretation of Title VII that equates sexual-orientation discrimination with sex discrimination. To the contrary, *Hopkins* does not even gesture in that direction. If the lower-court decisions involving "sex stereo-

---

*Airlines, Inc.*, 444 F.2d 1194, 1196 (7th Cir. 1971). This too was a straightforward case of sex discrimination. *Id.* at 1198 (holding that "it is clear that United has contravened [Title VII] by applying one standard for men and one for women").

typing" are a confusing hodgepodge—and I agree that they
are—the confusion stems from an unfortunate tendency to
read *Hopkins* for more than it's worth. That's not a reason to
embed the confusion in circuit law.

C

Neither does *Oncale* compel or support today's decision.
*Oncale* held only that same-sex sexual harassment may, in an
appropriate case, support a claim under Title VII *provided*
that it "meets the statutory requirements." 523 U.S. at 79–80.
The Court reiterated that in *all* sex-discrimination cases,
including sexual-harassment cases, "[t]he critical issue,
Title VII's text indicates, is whether members of one sex are
exposed to disadvantageous terms or conditions of employ-
ment to which members of the other sex are not exposed."
*Id.* at 80 (quotation marks omitted).

The plaintiff in *Oncale*, a male roustabout on an oil plat-
form in the Gulf of Mexico, alleged that his male coworkers
regularly subjected him to "sex-related, humiliating" verbal
and physical harassment. *Id.* at 77. The lower courts dis-
missed his claim based on an approach that categorically
rejected same-sex harassment cases under Title VII. The
Supreme Court reversed, holding that "nothing in Title VII
necessarily bars a claim of discrimination 'because of … sex'
merely because the plaintiff and the defendant (or the per-
son charged with acting on behalf of the defendant) are of
the same sex." *Id.* at 79.

To sketch the circumstances in which evidence of same-
sex harassment might support a claim of sex discrimination,
the Court first explained how evidence of workplace har-
assment permits an inference of sex discrimination as a

general matter. The Court explained, for example, that in an opposite-sex harassment case involving "explicit or implicit proposals of sexual activity," an inference of sex discrimination is easy to draw because "it is reasonable to assume those proposals would not have been made to someone of the same sex." *Id.* at 80. But the same is not true in a case involving same-sex harassment *unless* the evidence shows that the harasser is homosexual; only then would it be reasonable to infer that the victim was targeted because of his sex.[9] *Id*.

The Court offered two other examples of conduct that might support an inference of sex discrimination in a same-sex harassment case. The first is when a harasser uses "such sex-specific and derogatory terms" as to make it clear that he "is motivated by general hostility to the presence of [members of the same sex] in the workplace." *Id.* The second is when the plaintiff offers "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Id.* at 80–81. Because the record was undeveloped on these points, the Court remanded for further proceedings. *Id.* at 82.

---

[9] Note that the Court's focus is on the sexual orientation of the harasser, *not* the sexual orientation or attributes of the harassment victim. Some lower courts have missed this important point and mistakenly allowed same-sex harassment cases to proceed to the extent that the victim alleges he suffered harassment based on his supposed "gay behaviors." This has predictably drawn an objection that the law should not distinguish between claims of discrimination for "acting gay" and claims of discrimination for "being gay." Indeed it should not. On a proper understanding of the limits of *Hopkins* and *Oncale*, neither claim is actionable under Title VII. *Both* are claims of sexual-orientation discrimination, which is not covered by the statute.

In short, in authorizing claims of same-sex harassment as a theoretical matter, the Court carefully tethered *all* sexual-harassment claims to the statutory requirement that the plaintiff prove discrimination "because of sex." Nothing in *Oncale* eroded the distinction between sex discrimination and sexual-orientation discrimination or opened the door to a new interpretation of Title VII.

*Oncale* was not a revolutionary decision. In contrast, today's decision by the en banc court works a profound transformation of Title VII by any measure.

D

The majority also finds support for its decision in "the backdrop of the Supreme Court's decisions … in the area of broader discrimination on the basis of sexual orientation," citing *Romer v. Evans*, 517 U.S. 620 (1996); *Lawrence v. Texas*, 539 U.S. 558 (2003); *United States v. Windsor*, 133 S. Ct. 2675 (2013); and *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015). Majority Op. at p. 19.

But the majority's position is actually irreconcilable with these cases. First, *Lawrence* was decided solely under the Due Process Clause; it was not an equal-protection case. 539 U.S. at 564. In the other cases, far from collapsing the well-understood distinction between sex discrimination and sexual-orientation discrimination, the Court actually preserved it. The Court assigned these two distinct forms of discrimination to different analytical categories for purposes of equal-protection scrutiny. If sex discrimination and sexual-orientation discrimination were really one and the same, then the Court would have applied the intermediate standard of scrutiny that governs judicial review of laws that

classify people by sex. *See United States v. Virginia*, 518 U.S. 515, 531 (1996). It did not do so.

E

Finally, drawing especially on *Obergefell*, my colleagues worry that adhering to the long-settled interpretation of Title VII "creates 'a paradoxical legal landscape in which a person can be married on Saturday and then fired on Monday for just that act.'" Majority Op. at p. 5 (quoting *Hively v. Ivy Tech Cmty. Coll.*, 830 F.3d 698, 714 (7th Cir. 2016)). The concern is understandable, but my colleagues conflate the distinction between state action, which is subject to constitutional limits, and private action, which is regulated by statute. The Due Process and Equal Protection Clauses are constitutional restraints on government. Title VII is a statutory restraint on employers. The legal regimes differ accordingly. Any discrepancy is a matter for legislative, not judicial, correction.

\*   \*   \*

If Kimberly Hively was denied a job because of her sexual orientation, she was treated unjustly. But Title VII does not provide a remedy for this kind of discrimination. The argument that it *should* must be addressed to Congress.

**IV**

This brings me to my last point, which concerns the principle of *stare decisis*. The general rule is that "*stare decisis* … has 'special force'" in the domain of statutory interpretation "for 'Congress remains free to alter what we have done.'" *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139 (2008) (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 172–73 (1989)). Special force or no, the foundational

assumptions of the rule of law and due regard for the pru-
dential virtues of stability, reliability, and predictability
should inspire some caution here. A decision to upend
settled precedent "demands special justification." *Michigan v.
Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2036 (2014) (quoting
*Arizona v. Rumsey*, 467 U.S. 203, 212 (1984)). That "special
justification" must *at least* begin with a convincing case that
the challenged precedent is gravely wrong.

As I've explained, a convincing case has not been made.
If more is needed, consider for a moment the next step in
this litigation. When this case returns to the district court, it
will not matter whether the evidence shows that Ivy Tech
rejected Hively in favor of male applicants, female appli-
cants, or a combination of men and women. If the facts show
that Ivy Tech hired heterosexuals for the six full-time posi-
tions, then the community college may be found liable for
discriminating against Hively *because of her sex*.[10] That will be
so even if *all six positions were filled by women*. Try explaining
that to a jury.

*       *       *

In the end, today's decision must be recognized for what
it is: a new form of Title VII liability based on *imputed* mo-
tive, not *actual* motive. The majority's new rule—that sexual-
orientation discrimination = sex discrimination—imputes to
the employer a motive that is not, and need not be, present
in fact. Liability under this new "theory" of sex discrimina-
tion does not require the jury to find that the employer's
decision was *actually* motivated by the plaintiff's sex. That's a

---

[10] Unless, of course, Ivy Tech can show that Hively was less qualified
than the applicants who were hired.

necessary predicate for liability in all other sex-discrimination cases, but not here. Discrimination "because of sex" need not be found as a fact; instead, the court will impute the statutorily forbidden motive to the employer if the plaintiff proves discrimination "because of sexual orientation."

* * *

This brings me back to where I started. The court's new liability rule is entirely judge-made; it does not derive from the text of Title VII in any meaningful sense. The court has arrogated to itself the power to create a new protected category under Title VII. Common-law liability rules may judicially evolve in this way,[11] but statutory law is fundamentally different. Our constitutional structure requires us to respect the difference.

It's understandable that the court is impatient to protect lesbians and gay men from workplace discrimination without waiting for Congress to act. Legislative change is arduous and can be slow to come. But we're not authorized to amend Title VII by interpretation. The ordinary, reasonable, and fair meaning of sex discrimination as that term is used in Title VII does not include discrimination based on sexual orientation, a wholly different kind of discrimination. Because Title VII does not by its terms prohibit sexual-orientation discrimination, Hively's case was properly dismissed. I respectfully dissent.

---

[11] Though the state supreme courts, not the federal courts, are empowered to adjust common-law rights and remedies.